**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Thomas Paul West, Gregory Dickens, Charles M. Hedlund, Robert Wayne Murray, Theodore Washington, and Todd Smith,<br><br>          Plaintiffs,<br><br>vs.<br><br>Janice K. Brewer, Governor of Arizona; Charles L. Ryan, Director, Arizona Department of Corrections; Ernest Trujillo, Warden, Arizona Department of Corrections - Eyman; Carson McWilliams, Warden, Arizona Department of Corrections - Florence; Does 1-50,<br><br>          Defendants. | No. CV-11-1409-PHX-NVW<br><br>**DEATH PENALTY CASE**<br><br>**AMENDED ORDER DENYING EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION** |

        This matter is before the Court for consideration of Plaintiff Thomas Paul West's emergency motion for a temporary restraining order or a preliminary injunction.  (Doc. 3.) Plaintiff West, an Arizona inmate under sentence of death, is scheduled to be executed on Tuesday, July 19, 2011, at 11:00 a.m.  On July 16, 2011, he filed the instant motion as well as a complaint pursuant to 42 U.S.C. § 1983 and an application to proceed *in forma pauperis*. (Docs. 1-3.)  The complaint alleges that the manner and means by which the Arizona Department of Corrections (ADC) intends to execute him will violate his Eighth Amendment

right to be free from cruel and unusual punishment.  The Court has considered the complaint and its exhibits, the emergency motion, and all responsive pleadings.  For the reasons that follow, the Court denies Plaintiff West's motion for a temporary stay of execution.

## BACKGROUND

The facts underlying Plaintiff West's conviction and death sentence for the 1987 murder of Donald Bortle in his Tucson home are detailed in the Arizona Supreme Court's decision on direct appeal and will not be repeated here.  *See State v. West*, 176 Ariz. 432, 436-37, 862 P.2d 192 196-97 (1993).  Because Plaintiff West committed his crime before November 23, 1992, under Arizona law he has the choice to be executed by either lethal injection or lethal gas.  *See* A.R.S. § 13-757(B).  According to the complaint, Plaintiff West declined to choose.  Consequently, ADC must use lethal injection to execute him.  *Id.*

In 2007, Plaintiffs filed a § 1983 complaint challenging numerous aspects of Arizona's then-in-effect lethal injection protocol.[1]  That protocol was based on Department Order 710, dated November 1, 2007, and as modified by an exhibit submitted by the parties as part of a joint report to the Court.  *See Dickens v. Brewer*, No. CV-07-1770-PHX-NVW, 2009 WL 1904294, at *1 & n.2 (D. Ariz. Jul. 1, 2009) (unpublished order).  On July 1, 2009, this Court granted summary judgment in favor of Defendants, concluding that Arizona's protocol was "substantially similar" to that approved by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), and thus did not subject inmates to a substantial risk of serious harm in violation of the Eighth Amendment.  *Id.*  On February 9, 2011, the Ninth Circuit Court of Appeals affirmed.  *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011).  The appellate court's mandate issued on April 18, 2011.

The version of the protocol at issue in *Dickens* required sequential administration of: (1) sodium thiopental, an ultra fast-acting barbiturate that induces unconsciousness; (2) pancuronium bromide, a paralytic neuromuscular blocking agent that prevents any voluntary

---

[1]     Plaintiff West was not a party to this initial protocol challenge.

muscle contraction; and (3) potassium chloride, which causes skeletal muscle paralysis and cardiac arrest. "It is uncontested that, failing a proper dose of sodium thiopental that would render [a] prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride." *Baze*, 553 U.S. at 53.

In October 2010, Arizona prisoner Jeffrey Landrigan filed a § 1983 complaint on the eve of his execution describing a nationwide shortage of sodium thiopental and alleging that ADC had imported the drug from a non-FDA-approved foreign manufacturer. The district court granted a temporary restraining order to permit further discovery regarding efficacy of the drug. *Landrigan v. Brewer*, No. CV-10-2246-PHX-ROS, 2010 WL 4269559 (D. Ariz. Oct. 25, 2010) (unpublished order). The Supreme Court reversed, noting that there was "no evidence in the record to suggest that the drug obtained from a foreign source is unsafe." *Brewer v. Landrigan*, 131 S. Ct. 445 (2010).

Subsequently, Arizona prisoner Daniel Cook filed a complaint similar to that of Landrigan, alleging an unconstitutional risk of serious pain from use of non-FDA approved sodium thiopental. The district court dismissed the complaint, finding that it failed to sufficiently state a claim for relief. *Cook v. Brewer*, No. CV-10-2454-PHX-RCB, 2011 WL 251470 (D. Ariz. Jan. 26, 2011) (unpublished order). The Ninth Circuit affirmed and noted that Arizona's protocol contains safeguards that would prevent the administration of the second and third drugs if the prisoner were not sufficiently anesthetized. *Cook v. Brewer*, 637 F.3d 1002, 1007-08 (9th Cir. 2011) (*Cook I*). Based on newly-discovered evidence surrounding the foreign-manufactured sodium thiopental and ADC's acquisition thereof, Cook refiled a complaint on the eve of his execution. The district court summarily dismissed the complaint, and the Ninth Circuit affirmed. *Cook v. Brewer*, --- F.3d ----, No. 11-15743, 2011 WL 1213095 (9th Cir. Apr. 1, 2011) (*Cook II*), *cert. denied*, 131 S. Ct. 2465 (2011); *Cook v. Brewer*, No. CV-11-557-PHX-RCB, 2011 WL 1119641 (D. Ariz. Mar. 28, 2011)

1   (unpublished order).

2         On May 24, 2011, the night before the scheduled execution of Arizona prisoner

3   Donald Beaty, ADC notified Beaty and the Arizona Supreme Court that it intended to

4   substitute pentobarbital for sodium thiopental in carrying out Beaty's execution but that

5   Arizona's lethal injection protocol would otherwise remain the same as used in prior

6   executions.  (Doc. 1, Ex. J at 1.)  ADC noted that Arizona's protocol authorized ADC's

7   Director to make such a change and that the drug was obtained domestically.  (*Id.*)  ADC also

8   indicated that on this same day (May 24) a United States Associate Deputy Attorney General

9   contacted the Arizona Attorney General's Office requesting that the sodium thiopental ADC

10  imported from a foreign source not be used in Beaty's execution because the Drug

11  Enforcement Administration believed ADC failed to fill out one of the forms necessary for

12  importation of the drug.  (*Id.* at 2.)

13        Beaty filed a § 1983 complaint.  He asserted a due process violation from insufficient

14  notice and argued that the last-minute drug substitution would make it impossible for ADC

15  to comply with the protocol's training requirement, thus subjecting him to a substantial risk

16  of pain and suffering.  This Court denied injunctive relief, concluding *inter alia* that the lack

17  of practice with pentobarbital was insufficient to demonstrate a risk of serious harm in light

18  of the protocol's safeguards ensuring the prisoner's anesthetization prior to administration

19  of pancuronium bromide and potassium chloride.  *Beaty v. Brewer*, --- F.Supp.2d ----, No.

20  CV-11-1037-PHX-NVW, 2011 WL 2050124, at \*5 (May 24, 2011).   The Ninth Circuit

21  affirmed, and the Supreme Court denied certiorari.  *Beaty v. Brewer*, --- F.3d ----, No. 11-

22  99007, 2011 WL 2040916, at \*6 (9th Cir.), *cert. denied*, 131 S. Ct. 2929 (May 25, 2011).

23        On June 10, 2011, ADC formally amended Department Order 710 to provide for the

24  administration of sodium pentothal (thiopental) *or* pentobarbital as the first of the three

25  sequentially-administered drugs.  (Doc. 1, Ex. C at Attach. F.)

26        At 5:30 p.m. on July 14, 2011, Plaintiffs, through the Office of the Federal Public

27

- 4 -

1  Defender, received documents from ADC disclosed in response to a complaint filed by the
2  Federal Public Defender in the Maricopa County Superior Court seeking enforcement of a
3  request for public records made on February 3, 2011.  (Doc. 1, Ex. A-B.)  According to
4  Plaintiffs, these documents "reveal Defendants' awareness of problems with the British
5  distributor that provided them with Sodium Thiopental" and suggest that ADC may have
6  "deviated from mandatory practice requirements."  (Doc. 1 at 4.)

7                                      **DISCUSSION**

8       In their § 1983 complaint, Plaintiffs allege that ADC's unwillingness to follow its
9  written lethal injection protocol and its use of pentobarbital in place of sodium thiopental
10 create a substantial risk that they will suffer unnecessary pain during execution, in violation
11 of the Eighth Amendment.  (Doc. 1 at 14-18.)  Plaintiff West has moved for a temporary
12 restraining order or a preliminary injunction to enjoin his execution and to allow for litigation
13 of these claims.  (Doc. 3.)

14      The standard for issuing a temporary restraining order is essentially the same as that
15 for issuing a preliminary injunction.  To be entitled to injunctive relief, a movant must
16 demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable
17 harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4)
18 an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct.
19 365, 374, 376 (2008); *National Meat Ass'n v. Brown*, 599 F.3d 1093, 1097 (9th Cir. 2010);
20 *see also Beardslee v. Woodford*, 395 F.3d 1064, 1067 (9th Cir. 2005).  The burden of
21 persuasion is on the movant, who must make "a clear showing."  *Mazurek v. Armstrong*, 520
22 U.S. 968, 972 (1997) (per curiam).

23      In the context of a capital case, the Supreme Court has emphasized that these
24 principles apply when a condemned prisoner asks a federal court to enjoin his impending
25 execution because "[f]iling an action that can proceed under § 1983 does not entitle the
26 complainant to an order staying an execution as a matter of course."  *Hill v. McDonough*, 547

27

U.S. 573, 583-84 (2006).  Rather, "a stay of execution is an equitable remedy" and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.* at 584.  In addition, "[a] court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief." *Beardslee*, 395 F.3d at 1068 (quoting *Gomez v. United States District Court*, 503 U.S. 653, 654 (1991)).  Thus, courts "must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim." *Id.* (quoting *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004)).

**I.     Likelihood of Success**

   **A.     Relevant Legal Standard**

   The Eighth Amendment "prohibits punishments that involve the unnecessary and wanton inflictions of pain, or that are inconsistent with evolving standards of decency that mark the progress of a maturing society." *Cooper v. Rimmer*, 379 F.3d 1029, 1032 (9th Cir. 2004).   That prohibition necessarily applies to the punishment of death, precluding executions that "involve torture or a lingering death, or do not accord with the dignity of man." *Beardslee*, 395 F.3d at 1070.  A violation of the Eighth Amendment can be established by demonstrating there is a risk of harm that is "*sure or very likely* to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33, 34 (1993). In other words, there must be a "substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

   In *Baze v. Rees*, the Supreme Court held that Kentucky's method of execution by lethal injection was consistent with the Eighth Amendment.  The decision encompassed seven separate opinions involving three blocks of Justices.  In *Ventura v. State*, 2 So.3d 194, 200 (Fla. 2009), the Florida Supreme Court observed that the *Baze* plurality:

   adopted a version of the substantial-risk standard, while Justice Breyer,
   concurring in the judgment, and Justices Ginsburg and Souter, dissenting,

adopted a version of the unnecessary-risk standard.  In contrast, Justices Thomas and Scalia renounced any risk-based standard in favor of a rule of law that would uphold any method of execution which does not involve the *purposeful* infliction of "pain and suffering beyond that necessary to cause death."  Justice Stevens did not provide a separate standard but, instead, expressed general disagreement with (1) the death penalty based upon his long experience with these cases and the purported erosion of the penalty's theoretical underpinnings (deterrence, incapacitation, and retribution), and (2) the allegedly unnecessary use of the paralytic drug pancuronium bromide.

*Id.* at 199-200 (citations and footnotes omitted).  In response to Justice Stevens's suggestion that the plurality opinion leaves the disposition of other cases uncertain, Chief Justice Roberts wrote:

[T]he standard we set forth here resolves more challenges than [Justice Stevens] acknowledges.  *A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain*.  He must show that the risk is substantial when compared to the known and available alternatives.  A State with a lethal injection protocol similar to the protocol we uphold today would not create a risk that meets this standard.

*Baze*, 553 U.S. at 61 (emphasis added).

### B.    Claim One—Protocol Deviations

Plaintiffs allege that ADC has substantially deviated from its lethal injection protocol and thus there is a substantial risk that the anesthetic drug will not be properly administered, causing serious harm.  (Doc. 1 at 15.)  Plaintiffs cite to five deviations:  (1)  failure to adequately train the execution team using pentobarbital; (2) failure to legally obtain drugs from a safe and reputable source; (3) use of the femoral vein as the default access site; (4) failure to leave IV insertion sites uncovered during executions; and (5) the substitution of pentobarbital for sodium thiopental.  (*Id.* at 7-9, 13.)  The Court concludes that none are so consequential that Plaintiff West has established a likelihood of success on his claim that he will not be properly anesthetized prior to administration of pancuronium bromide and potassium chloride.

Plaintiffs assert that ADC was unable to carry out its minimum training requirements—ten practices using pentobarbital—prior to executing Donald Beaty on May

1   25, 2011.  According to an ADC training log, fifteen practice sessions took place between

2   January 1 and May 24, 2011.  (Doc. 1, Ex. L.)  However, the log does not indicate which

3   anesthetic drug, if any, was used during these practices.  Even assuming pentobarbital was

4   not utilized, this would not appear to be a deviation from the protocol as the protocol does

5   not specifically require that execution rehearsals include mixing or using the drugs.[2]  (*See*

6   Doc. 1, Ex. C, Attach. F at § B.5.)  And even if the protocol contained such a requirement,

7   in light of the exigent circumstances caused by the Department of Justice's last-minute

8   request not to use sodium thiopental, any failure to practice with pentobarbital does not

9   demonstrate, as urged by Plaintiffs, a "willful disregard" of the protocol.  (Doc. 1 at 13.)

10  Lastly, as discussed below with regard to Claim Two, any risk of harm from failing to

11  practice mixing the chemicals is ameliorated by the protocol's consciousness checks.

12          For the same reasons, the Court is unpersuaded by Plaintiffs' allegation that ADC did

13  not follow its training requirements with respect to the use of pancuronium bromide during

14  rehearsals.  Plaintiffs cite a September 2010 email to ADC's Deputy Director from an

15  unknown sender as evidence ADC likely substituted saline during practices due to a shortage

16  of pancuronium bromide.  (Doc. 1, Ex. I.)  The email "recommend[s]" substituting saline or

17  another product given ADC's short supply of pancuronium bromide.  (*Id.*)  However, within

18  days of this email, ADC ordered and received a shipment of pancuronium from Los Angeles.

19  (*See* Doc. 1, Ex. J, Attach. B.)  Plaintiffs' speculative assertion that saline may have been

20  substituted in practices is insufficient to establish a likelihood of success on the merits,

21  especially give the protocol's silence on the use of actual drugs during execution rehearsals.

22          Petitioner next complains that ADC illegally obtained sodium thiopental and the other

23

24          [2]      Any suggestion to the contrary in this Court's *Beaty* decision, 2011 WL
     2050124, at *4, was based on a broad reading of a protocol provision that does not actually
25   support that specificity.  The protocol provision states:  "The Division Director for Offender
     Operations and the Medical Team leader shall ensure that all team members thoroughly
26   understand all provisions contained herein as written and by practice."  (Doc. 1, Ex. C,
     Attach. F at § B.6.)
27

1   two drugs from a foreign supplier about which ADC had concerns.  (Doc. 1 at 7-8.)  In

2   support, they proffer an email to the Deputy Director cautioning that the foreign supplier's

3   "website leaves something to be desired" and wondering whether the supplier was "reputable

4   and where exactly the medication would be coming from."  (Doc. 1, Ex. K.)  First, the

5   acquisition of sodium thiopental is irrelevant in light of ADC's intent to anesthesize Plaintiff

6   West with pentobarbital.  Second, ADC obtained pancuronium bromide and potassium

7   chloride from a domestic supplier as well as a foreign one and indicated in the Beaty case

8   that it intended to carry out executions using drugs obtained domestically.  (*See* Doc. 1, Ex.

9   J at 1 & Attach. B-C.)  Third, Plaintiff has not explained how the legality of importing drugs

10  affects the constitutionality of their use.  *See Cook II*, 2011 WL 1213095, at *3; *Cook I*, 637

11  F.3d at 1007 n.3.

12         Plaintiffs argue that ADC has failed to follow protocol by using the femoral vein as

13  the access site for the intravenous line in several recent executions.  However, the protocol

14  expressly states femoral access is permissible if the Medical Team Leader determines that

15  it is not possible to place a reliable peripheral line.  (Doc. 1, Ex. C, Attach. F at § G.8.)

16  Similarly, Plaintiff alleges that ADC violated its protocol by failing to insert a backup IV

17  catheter in two executions (Doc. 13 at 3 n.1), but the protocol provides that a backup is

18  unnecessary if the Medical Team Leader determines it is not possible to place two lines.

19  (Doc. 1, Ex. C, Attach. F at § G.1.)

20         Plaintiffs further allege that ADC covered the intravenous insertion sites during recent

21  executions, in contravention of the protocol.  (Doc. 1 at 9; *see* Doc. 1, Ex. C, Attach. F at §

22  G.5.)  Even if true, the Court concludes that this minor deviation is insufficient to establish

23  a likelihood of success on Plaintiffs' Eighth Amendment claim.  In upholding this Court's

24  ruling in *Dickens*, the Ninth Circuit observed that the plaintiffs faced an uphill battle in trying

25  to demonstrate a substantial risk of improper anesthetization from a failure to follow

26  protocol.  *Dickens*, 631 F.3d at 1146.  "[T]he evidence must show more than single accident

27

1    or mistake or failure to follow the Protocol." *Id.* at 1147. Here, even assuming ADC has

2    failed in the past several executions to follow protocol with respect to leaving visible the

3    intravenous insertion site, Plaintiffs do not explain how such deviation creates a significant

4    risk of unnecessary pain or suffering. Moreover, if the intravenous site during these

5    executions was accessed through a femoral vein in the prisoner's groin area, it might not

6    have been logistically possible to leave the site completely uncovered.

7         Finally, Petitioner points to ADC's last-minute substitution of pentobarbital in the

8    Beaty case as evidence that ADC is unable to follow its protocol as written. (Doc. 1 at 13.)

9    As already explained, however, exigent circumstances led to this change. As such, it was not

10   an arbitrary protocol deviation but a practical one ultimately made necessary by the

11   increasing difficulty of obtaining the chemicals needed to carry out lawfully-imposed

12   sentences of death. Although Plaintiffs focus on ADC's deviation from the protocol's literal

13   requirements, the relevant issue is whether such deviation creates a substantial risk of serious

14   harm. The Court concludes that Plaintiff West has failed to make a "clear showing" that it

15   does. *See Baze*, 553 U.S. at 50 ("[A]n isolated mishap alone does not give rise to an Eighth

16   Amendment violation, precisely because such an event, while regrettable, does not suggest

17   cruelty, or that the procedure at issue gives rise to a substantial risk of serious harm.").

18        **C.    Claim Two—Use of Pentobarbital**

19        Plaintiffs allege that although pentobarbital is a barbiturate like sodium thiopental,

20   unlike sodium thiopental it is untested for use as an anesthetic and lacks a standard

21   recognized dosage for inducing anesthetic coma. (Doc. 1 at 5, 10-11.) Plaintiffs also assert

22   that the manufacturer of pentobarbital has warned that the drug is not intended as an

23   anesthetic. (*Id.* at 10, 15-16.) Therefore, according to Plaintiffs, there is a substantial risk

24   that pentobarbital, even if successfully injected, may not prevent needless pain and suffering.

25   (*Id.* at 11, 15.) Plaintiffs further allege, based on problems reported during executions in

26   Alabama and Georgia as well as the affidavit of Dr. David Waisel, that the consciousness

27

1    checks in Arizona's protocol are insufficient to ensure unconsciousness prior to

2    administration of pancuronium bromide and potassium chloride.  (*Id.* at 12-13, 16-17.)

3         To show a likelihood of success on the merits of his Eighth Amendment claim,

4    Plaintiff must demonstrate that the use of pentobarbital as an anesthetic creates a

5    "demonstrated risk of severe pain."  *Baze*, 553 U.S. at 61.  Both the Tenth and Eleventh

6    Circuits have expressly addressed this issue and found that use of pentobarbital does not

7    create a substantial risk of serious harm.  *See Powell v. Thomas*, No. 11-12238, 2011 WL

8    1899564, at *2(11th Cir. May 19, 2011) (unpublished order), *cert. denied*, 131 S. Ct. 2487

9    (2011); *Pavatt v. Jones*, 627 F.3d 1336, 1340 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 974

10   (2011).  Notably, the plaintiff in *Pavatt* conducted discovery, submitted an expert report,

11   and participated in an evidentiary hearing.  In addition, pentobarbital has been used either

12   singularly or as a substitute for sodium thiopental in executions in several other states.

13        Dr. Waisel opines that because pentobarbital has rarely been used in an operating

14   room to anesthesize patients, "significant unknowns" about its use as an anesthesia "puts the

15   inmate at risk of needless pain and suffering."  (Doc. 1, Ex. D at 5.)  This is nothing more

16   than speculation and was rejected by the court in *Pavatt*, who found "no clear error in finding

17   that the amount of pentobarbital selected for use by the [Oklahoma Department of

18   Corrections] as part of its protocol was sufficient to induce unconsciousness in an inmate."

19   627 F.3d at 1340.  Similarly, Dr. Waisel asserts that pentobarbital failed to properly

20   anesthetize two of the 16 inmates executed using pentobarbital, but again this is pure

21   speculation as Plaintiffs have produced no evidence demonstrating that any problems in those

22   cases were caused by the drug itself rather than misadministration.

23        Moreover, Arizona's protocol has significant safeguards in place to ensure that a

24   prisoner is fully anesthetized prior to administration of pancuronium bromide and potassium

25   chloride.  As noted by this Court in *Dickens*, although electronic monitors may be used to

26   measure brain activity, physical examination such as stroking a patient's eyelashes to look

27

- 11 -

for reflex and monitoring his breathing pattern is as good or better for assessing the depth of

anesthesia.  2009 WL 1904294, at *12.  To this end, the Arizona protocol:

> requires that a microphone "be affixed to the inmate's shirt to enable the Medical Team and Special Operations Team Leader to verbally communicate directly with the inmate and hear any utterances or noises made by the inmate throughout the procedure." It requires that the inmate "be positioned to enable the Medical Team and Special Operations Team Leader to directly observe the inmate and to monitor the inmate's face with the aid of a high resolution color NTSC CCD camera with 10x Optical zoom lens with pan tilt capability and a 19-inch resolution color monitor."   It requires the Medical Team to "continually monitor the inmate's level of consciousness and electrocardiograph readings, maintaining constant observation of the inmate utilizing direct observation, audio equipment, camera and monitor as well as any other medically approved method(s) deemed necessary by the Medical Team." It requires the warden to "physically remain in the room with the inmate throughout the administration of the chemicals in a position sufficient to clearly observe the inmate and the primary and backup IV sites for any potential problems." Further, after administration of the sodium thiopental and heparin/saline flush, the Medical Team must "confirm the inmate is unconscious by sight and sound, utilizing the audio equipment, camera and monitor," and a Medical Team member must "enter into the room where the inmate is located to physically confirm the inmate is unconscious, and that the catheter and lines are affixed and functioning properly, using methods deemed medically necessary."   Although the Arizona Protocol does not define "methods deemed medically necessary," it is likely that Medical Team members, who must be medically trained, would be able to assess consciousness by telling the patient to respond and, upon receiving no response, be able to look for a simple reflex response to a tactile stimulus.

*Id.,* at *21.  If it appears that a prisoner is not fully anesthetized, the protocol prohibits the

administration of any further drugs.

Dr. Waisel opines that Arizona's consciousness checks are insufficient because the

protocol does not specify the training, skills, and certification of the Medical Team Leader

conducting the check.  (Doc. 1, Ex. D at 7.)  However, the Ninth Circuit has specifically

determined that the consciousness checks required by the protocol are adequate to ensure that

a prisoner is anesthetized prior to administration of the second and third drugs.  *See Cook I*,

637 F.3d at 1007-08.  Dr. Waisel's affidavit does not undermine the Circuit's ruling or

suggest that anesthetization using pentobarbital instead of sodium thiopental requires a

different level of skill in assessing consciousness.

Finally, the Court does not find the manufacturer's "warning" against pentobarbital

use in executions to be persuasive.  Although the company relayed to the Georgia Department of Corrections it could not "assure the associated safety and efficacy" of using pentobarbital for off-label use, it also made clear that it was "adamantly opposed" to the use of pentobarbital "or any product for that matter, for the purpose of capital punishment" because such use "contradicts everything we are in business to do—provide therapies that improve people's lives."  (Doc. 1, Ex. N.)  This is insufficient evidence to establish a substantial risk of harm.

For all of these reasons, the Court concludes that Plaintiff West has failed to show a likelihood of success on the merits of his Eighth Amendment claim.

**II.    Irreparable Harm**

The Court also concludes that Plaintiff West has not shown that he is likely to suffer irreparable harm in the absence of a stay.  Plaintiff West asserts that he is at risk of suffering pain if the pentobarbital does not adequately anesthetize him.  However, any risks from using pentobarbital in lieu of sodium thiopental is substantially mitigated by the safeguards outlined above that will ensure Plaintiff West is fully anesthetized before the second and third drugs are administered.

**III.   Balance of Equities & Public Interest**

Plaintiff West murdered Donald Bortle twenty-four years ago.  In *Hill v. McDonough*, the Supreme Court recognized the "important interest in the timely enforcement of a sentence" and cautioned that federal courts "can and should protect States from dilatory or speculative suits."  547 U.S. at 584-85.  Given the State's "strong interest in enforcing its criminal judgments without undue interference from the federal courts," and because "the victims of crime have an important interest in the timely enforcement of a sentence," the Court concludes that the balance of equities favors Defendants and that a stay of execution to resolve Plaintiff West's speculative allegations is not in the public interest.  *Id.* at 584.

The Court also observes that although there was some delay by Defendants in fully

- 13 -

complying with the Federal Public Defender's public records request, the two newly-released emails referenced by Plaintiffs in their complaint provide only tangential support for their claims.   The main thrust of the complaint—inefficacy of pentobarbital for use as an anesthetic and ADC protocol deviations—could have been asserted at least by the end of May when Beaty was executed using pentobarbital or shortly after the allegedly problematic execution in Georgia on June 23.   The Court finds that Plaintiff West unnecessarily delayed filing suit until July 16, just three days before his scheduled execution.   Therefore, equity also favors denial of his request for a stay.   *See Nelson v. Campbell*, 541 U.S. at 649-50.

## CONCLUSION

Plaintiff West has not demonstrated entitlement to injunctive relief.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff West's Emergency Motion for Temporary Restraining Order or Preliminary Injunction (Doc. 3) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff West's Application to Proceed *In Forma Pauperis* (Doc. 2) is **GRANTED**.

Dated: July 18, 2011.

_____
Neil V. Wake
United States District Judge